In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-21-00219-CV
IN THE INTEREST OF J.L.C.

**On Appeal from the 279th District Court**
**Jefferson County, Texas**
**Trial Cause No. F-237,733**

## MEMORANDUM OPINION

Complaining the trial court abused its discretion in granting *Mother* "the exclusive right to designate their son *Blake's* primary residence within Jefferson County, Texas, and contiguous counties, OR Washington State," Father appealed.[1] Based on the evidence the trial court heard in the hearing it conducted in this suit affecting their parent-child relationship (SAPCR) on Mother's petition to resolve issues of

---

[1]We use pseudonyms to protect the minor's identity. Tex. R. App. P. 9.8 (Protection of Minor's Identity in Parental-Rights Termination Cases).

conservatorship, possession, and access, we conclude that Father has not established an abuse of discretion occurred. For the reasons explained below, we will affirm.

Background

The information we present in this section is based on Mother's and Father's testimony from the hearing the trial court conducted on Mother's SAPCR. Mother and Father were the only witnesses who testified during the hearing. According to Mother, Mother and Father never married. The testimony shows that in 2018, Mother and Father began a long-distance relationship while Mother was working as a physician's assistant in Dallas and Father was working at a refinery in Southwest Louisiana while living in Beaumont.

In 2019 and before Blake was conceived, Mother's relationship with Father became more serious, and she decided to move closer to where Father lived. Mother moved to Houston after finding a job at a cardiology clinic there. After Mother began living in Houston, she became pregnant, which according to Mother left her with two choices: (1) move to Seattle, Washington, which is where she grew up so that her family could help

2

her when she had her baby; or (2) move to Beaumont, where Father lived so that he could help her raise the child.

Mother chose to move to Beaumont, although she claimed that Father told her he would support her decision if she chose to move to Seattle if things didn't work out. Mother bought a home in a new subdivision, which was being developed in Beaumont. Father did not help buy the home.

That November, Mother and Father moved into the home. However, Mother couldn't find work as a physician's assistant in Beaumont, so she continued to commute to Houston for work.

In March 2020, Blake was born. According to Mother, she returned to work three months later. Mother explained that despite Father's promise to help her with the baby, to pay the household's bills, and to support her moving back to Washington should things not work out, none of his promises turned out to be true. Because Mother and Father had full-time jobs, Mother hired a nanny to care for Blake. Mother explained that on occasion when she came come home from work, she found Father playing video games while the nanny was taking care of Blake.

3

During the hearing, Mother explained why she wanted to raise Blake in Washington. Her testimony focuses on the support structure she claims is available to here there because her parents, family, and friends live in that state. Mother added that were the court to expand her rights to include designating Blake's primary residence in the state of Washington, it would be beneficial to Blake because he would have family there to care for him while she was at work. According to Mother, another benefit to Blake would be that she has an extensive network of friends in Washington who have children around Blake's age, children who are available to play with Blake. According to Mother, she does not have a similar network in Texas since other than Father, she has no other friends.

Mother explained why having a support system available where a member of her family could take care of Blake when she was at work or he was sick would help her financially, explaining she wouldn't be required to hire a nanny so that she had to take time off from her job. Mother added that missing work was difficult for her because her occupation as a physician's assistant required her to cancel her schedule when she missed work. Mother pointed to several times that had occurred

4

in the past year, as Father wouldn't take time off from his job to take care of Blake.

Mother described the number of family members she has in Washington, and she testified they were available and willing to help her raise Blake. She also described the types of recreational opportunities she enjoyed while a child growing up, and she told the trial court that these were opportunities she wanted Blake to experience during his childhood too.

Father's testimony focused on his desire to have Blake available in Beaumont or a surrounding county so that he could exercise his rights of visitation. Currently, Father lives in Beaumont in a home that he leases with his parents. Father's testimony shows he graduated from high school in Beaumont and then attended college in Abilene to play football, where Father's parents moved with him so they could "help [him] out." Father met Mother in 2018, and after leaving college, he moved back to Beaumont with his parents. Mother decided to move to Houston to be closer to Father because their relationship became more serious and because Mother is licensed in Texas as a physician's assistant.

Father described what ties him to Beaumont and to southeast Texas during the hearing. According to Father, four members of his family currently reside in Beaumont—an older brother, his parents, and his maternal grandmother. Father also has two other brothers, one who lives in Lake Charles, Louisiana, and the other who lives in Michigan. Father's maternal grandmother is a resident of Beaumont, but Father didn't explain whether his grandmother lives with his parents in the home he leases or whether she has a separate home. Father said his extended family—his aunts, uncles, and cousins—live in Louisiana. Father testified he is employed as an operator planner at a chemical plant near Lake Charles, Louisiana. According to Father, he is not planning to change jobs, but if he does get transferred, his opportunity for a transfer would be to a company plant in South Africa. Father also explained that he earns approximately $65,000 per year in his current job.

The trial court heard testimony that even though Father is the non-custodial parent to a ten-year-old son, *Justin*, he has developed a good relationship with him despite that Justin now lives in Tyler, Texas with

his mother.[2] Father's custodial rights to Justin are governed by SAPCR order, signed by the judge of the 326th District Court of Taylor County. The geographical provision in that order allows Justin's mother to "determine the child's primary residence without regard to geographic location."

As Father tells it, he did try to help Mother with Blake. For example, Father testified that he changed Blake's diapers when they were soiled, that on occasion he changed Blake's diaper at night and would then take Blake to Mother, and that on occasion, he put Blake to bed. Father agreed, however, that he never fed Blake, but he explained he didn't do so because Blake was breastfed. Father also denied that playing video games kept him from caring for Blake. He testified he played video games as a way to unwind. However, Father didn't deny that as of August 2020, when Mother evicted Father from the home, he'd spent 528 hours playing just one specific game. Father asked the court to downplay the time he was spending playing video games, explaining the games were played "during COVID[,]" and he testified he would never play games over caring for his son. Father agreed that he refused to take

---

[2]A pseudonym.

off from his job on the one occasion that Mother asked him to leave work to care for Blake.

Except for the desire Father expressed to have Blake located where he could exercise his right to visitation, Father's remaining testimony focused on the degree to which Father's family members were likely to assist Mother with Blake's care should the trial court place restrict Mother to living in Jefferson County or surrounding counties. When questioned about why his parents hadn't provided more assistance than they did in caring for Blake, Father blamed Mother, claiming she wouldn't allow his parents to keep Blake because "they didn't meet [her] guidelines of having shots and records of vaccines."

At the court's request, Mother clarified that before allowing others to care for Blake, she wanted them to have two shots, one for the flu and another for Tetanus, Diptheria, and Pertussis (TDAP). Mother told the court that these shots guard a child against "the two most common killers for infants one-year-old." Father also testified that when he talked to his mother about caring for Blake, she told him "she could watch [Blake] but only [at] . . . certain times." Father didn't explain whether he spoke to his father about whether he was available to keep Blake so that Mother and

8

Father could work. In general, Father testified his family "was not attentive" to Blake after Blake was born, and he agreed that Mother's family "was excited" about "bringing in a new life to the family[.]"

In August 2020, Mother notified Father that she was evicting him from her home, and she also filed the SAPCR that same month. When the trial court signed the temporary orders, the court appointed Mother and Father as Blake's joint managing conservators. Under the temporary orders, the trial court gave Mother the exclusive right to designate Blake's primary residence within Jefferson County and contiguous counties.[3]

Before any evidence was presented in the hearing, Mother told the trial court she wanted the geographical restriction in the final order expanded so that as the child's managing conservator (custodial parent), her rights included the right to designate Blake's primary residence in Washington. Otherwise, Mother said she was satisfied with having the parties' duties and obligations remain as those the trial court gave them in the temporary orders. In response, Father told the trial court that he

---

[3]The temporary orders address visitation and child support, but we have left out the details regarding those rights and obligations because they are not relevant to the sole issue Father raised in his appeal.

opposed Mother's request to expand the geographical restriction to include Washington. And he also wanted the trial court to expand his visitation so the beginning and ending periods of possession were consistent with the periods in a standard possession order.[4] Mother agreed to Father's request, leaving Mother's request the sole issue left unresolved.

When the hearing ended, the trial court granted Mother's request. The trial court told the parties that Mother would be responsible "for getting [Blake] to the airport . . . at her cost. It's her cost round-trip. . . . so that's at least once a month." The trial court explained the remaining details would be in the trial court's order, stating "we're not go[ing to] relitigate whatsoever the geographic restriction. It is what it is." In the section of the trial court's final Order addressing the parties' conservatorship rights, the trial court found that its "orders are in the best interest of the child." As to the geographical restriction, the final Order grants Mother:

> the exclusive right to designate the primary residence of the child within Jefferson County, Texas, and contiguous counties, OR Washington State.

---

[4]*See* Tex. Fam. Code Ann. §§ 153.316, .317

The clerk's record does not show that Father filed a request asking the trial court to state in writing its findings of fact and conclusions of law.[5]

Standard of Review

The Texas Family Code directs that the child's best interest "shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."[6] We review a trial court's rulings on these issues under an abuse-of-discretion standard.[7] "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function."[8] A trial court abuses its discretion when it acts "without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably."[9] Thus, "[m]erely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a

---

[5]*See* Tex. R. Civ. P. 296.
[6]*See* Tex. Fam. Code Ann. § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").
[7]*Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex. 1982).
[8]*In re J.J.R.S.,* 627 S.W.3d 211, 218 (Tex. 2021).
[9]*Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

similar circumstance does not demonstrate that an abuse of discretion has occurred."[10]

## Analysis

### *Geographical Restriction*

When a trial court appoints parents as joint managing conservators, the court must either "establish, until modified by further order, a geographic area within which the conservator shall maintain the child's primary residence" or "specify that the conservator may determine the child's primary residence without regard to geographic location."[11] The evidence shows that Mother and Father moved to Beaumont and began living together in November 2019, but never married. By February 2020, Mother and Father had separated, and in March 2020, Blake was born. Although Father later moved back in the home, Mother evicted Father in August 2020 and sued to establish her rights and duties along with Father's rights and duties to Blake.

Even though the Family Code doesn't provide the factors a trial court should follow when deciding whether the custodial parent should

---

[10]*In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. 2002).
[11]Tex. Fam. Code Ann. § 154.134(b)(1)(A), (B).

be restricted to raising her child in Texas when the custodial parent desires to move with the child and live in another state, the Texas Supreme Court outlined relevant considerations in *Lenz v. Lenz*, 79 S.W.3d 10, 15-17 (Tex. 2002). In *Lenz*, the Texas Supreme Court addressed whether the trial court abused its discretion in rejecting a jury's verdict favoring her request to modify a provision in her divorce decree, which restricted the geographical residence of her children to Texas, so that she could move with her children to Germany.[12] The *Lenz* Court considered the following factors in determining whether relocation was in the best interest of the Lenz's children: (1) the reasons for and against the move; (2) the effect on extended family relationships; (3) the effect on visitation and communication with the possessory conservator to maintain a full and continuous relationship with his children; (4) whether the proposed visitation schedule would allow the possessory conservator to have a meaningful relationship with his children; and (5) the nature of contact the children have with both parents, and the age, community ties, health and educational needs of the children involved.[13]

---

[12] *Lenz v. Lenz*, 79 S.W.3d 10, 12 (Tex. 2002).
[13] *Id*. at 15-17.

In an appeal we decided in 2008, we applied the *Lenz* factors to affirm the trial court's decision restricting the residence of the custodial parent's children to Jefferson County and its contiguous counties.[14] In contrast to the circumstances with which we were presented in *Melancon*, in this case Mother testified she intended to move to another state, and the trial court lifted the restriction to allow her to move to a state that is over two thousand miles away.

Since the parties tried the issue to the court and because Father didn't request findings, we must imply all findings that are necessary to support the judgment if they are supported by the record.[15] In a bench trial, we must defer to the trial court's judgment regarding the evaluation it made as to the credibility of the witnesses and the evidence, as trial courts are given discretion in their role as the factfinder to weigh the evidence and to decide what witnesses to believe.[16] When as here the abuse of discretion standard applies, the appellate court asks (1) whether

---

[14]*Getschel-Melancon v. Melancon*, No. 09-07-396 CV, 2008 Tex. App. LEXIS 7858, at *3-*6 (Tex. App.—Beaumont Oct. 16, 2008, no pet.).

[15]*Black v. Dallas Cty. Child Welfare Unit*, 835 S.W.2d 626, 630 n. 10 (Tex. 1992).

[16]*See In re J.F.-G.*, 627 S.W.3d 304, 317 (Tex. 2021); *In re N.P.H.*, No. 09-15-00010-CV, 2016 Tex. App. LEXIS 10413, at *7 (Tex. App.—Beaumont Sep. 22, 2016, no pet.).

the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in applying its discretion.[17]

After considering the evidence, we conclude for the following four reasons the trial court did not abuse its discretion in granting Mother the exclusive right to establish Blake's primary residence in Washington. First, the record contains sufficient information upon which the trial court could exercise a judgment about whether allowing Mother the right to establish Blake's primary residence in Washington served Blake's best interest. On the record the parties developed, the trial court could have reasonably concluded that given Mother's occupation, Mother had a more extensive network in Washington that would provide her with the support she needed to help her raise the child. And even though Blake and four members of his family live in Beaumont, the trial court heard testimony from which it could have reasonably concluded that given Mother's limited network of connections and lack of family in Jefferson County and surrounding counties, those counties do not offer and likely

---

[17]*In the Interest of A.E.M.S.*, No. 09-07-410 CV, 2008 Tex. App. LEXIS 7572, at *3 (Tex. App.—Beaumont Oct. 9, 2008, no pet.).

15

will not offer Mother a comparable network of reliable caregivers who can provide Mother the help she will need to care for Blake given the demands of her schedule.

In addition to the background already mentioned, the evidence shows that Mother's mother and father are both retired. According to Mother, one is a doctor, the other a nurse, and both are available "24/7" to help care for Blake. As an example of Mother extended family network, over thirty children of Mother's family and friends attended Blake's first birthday party, Mother explained, a group of children that offer Blake opportunities for "play dates" with people from families that Mother knows, which Mother can't duplicate in Texas.

Blake's extended family is committed to help Blake too, Mother added, as his maternal grandmother traveled from Washington so she could testify if needed in the hearing. The maternal grandmother's testimony wasn't presented after Mother's attorney told the court that the testimony of the additional witness after Mother and Father had testified would simply reinforce Mother's testimony.

The trial court could have also reasonably concluded that Father's family wouldn't be able to provide Mother with the same level of childcare

16

that Mother could have if she lived in Washington. Mother testified that except for Father, she has no family or friends in Beaumont who have helped her care for Blake. Mother explained that Father's parents had not been able to help them due to their work schedules and that Father's mother was taking care of "an elderly aunt that is mentally disabled."[18] Consequently, Mother testified she put Blake in daycare so she could work after she couldn't find another reliable nanny when the first nanny that she hired quit after she found another job.

Mother told the court that Father had not shown he could care for Blake when he was sick during the week, as she explained that Father's work schedule prohibited him from watching Blake on short notice. Mother also testified that Father was given every opportunity to have a relationship with Blake after Blake was born, but he had chosen to play video games or had gone to his parents' home and refused counseling rather than working toward working to foster his relationships with them.

---

[18]Father did not testify about a disabled aunt who lived in Jefferson County.

Second, the record allowed the trial court to find that by moving to Washington, Mother believed she could earn a higher income than she could earn in Beaumont, which she thought would also benefit Blake. For instance, Mother testified that opportunities to work as physician's assistants are rare in Beaumont. And although Mother did find a job she took in Beaumont, the job came with no benefits, no health insurance, and no allowances for continuing medical education or licensing fees. Mother further testified that since she is paid on an hourly basis, she doesn't earn anything when she takes off work and stays home with Blake. According to Mother, there are many opportunities to work as a physician's assistant in Seattle, jobs that offer benefits and better opportunities to advance than she has available to her here.

Third, Father testified the reason he doesn't want Blake's primary residence to be in Washington is that he wants "to get as much time with [Blake] as possible." But the record allowed the trial court to believe that Father's opposition to Blake's living in Washington was more about Father's convenience and the increased expenses he would face in seeing his son than it had to do with whether it would serve Blake's best interest

to live in a place where an extended family network was available to care for him given Mother's career.

For instance, the trial court heard evidence from which it could have reasonably concluded that Father lived with Mother and Blake, he spent more time playing video games than he spent with Blake. Father even testified he didn't want Blake's primary residence to be in Houston because it would be "quite a bit of drive for me."

The evidence the trial court heard allowed the trial court to reasonably conclude that Father could maintain a close relationship with Blake despite the distance between Beaumont and Seattle, which is where Mother said she planned to move. Mother expressed a desire to encourage Blake's relationship with his father. For example, she testified that if allowed to move, she would do her part to ensure that Blake maintained a full and continuous relationship with Father. For instance, Mother testified she would accompany Blake on flights to and from Houston so that he could see his Father in Texas once a month at her expense. The trial court's order requires Mother to fly with Blake to Houston once a month at her expense to allow him to exercise his rights of visitation with Blake.

Finally, no testimony in the record shows Father has developed a close relationship with Blake which will adversely impact him if he is moved. There is no testimony that Blake has any special needs or that Blake has met or has a relationship with Father's other child. And we note the Order provides that the trial court may modify the order should the circumstances of the child or a person affected by the Order materially and substantially change. So if there is a material change in circumstances, Father may return to court and ask the trial court to modify the Order and place a narrower geographic limit on Mother's rights.

To be fair, we don't question Father's conclusion that the record shows it will be more difficult for him and for his family to develop and maintain a close relationship with Blake given the distances involved between Beaumont and Seattle, Washington. That said, the trial court addressed the burden Mother is creating by moving to another state by shifting some of those costs to Mother, requiring her to fly with Blake and pay for the expenses associated with the round-trip flights to Houston required so that Blake may see his Father at least once a month.

We also assume that the trial court, having heard testimony addressing the relatively short length of the parties romantic involvement and the conflicting testimony about what the parties discussed they would agree to if things between them didn't work out, decided that Washington would serve Blake's needs best given Mother's career, her opportunities to maximize her income, and her need to have reliable childcare provided by an extended network available to her from her family and friends. Under the circumstances, we conclude the trial court had sufficient information on which to exercise its discretion.[19] We hold that Father has not demonstrated that an abuse of discretion occurred when the trial court decided that expanding the geographical restriction to include Washington was in Blake's best interest under the circumstances of the parties to this case.

We overrule Father's sole issue and affirm the trial court's Order.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on March 7, 2023
Opinion Delivered July 27, 2023
Before Golemon, C.J., Horton and Wright, JJ.

---

[19] *Melancon*, 2008 Tex. App. LEXIS 7858, at *6.